**UNITED STATES of America**

v.

**David DELLE DONNA and Anna Delle Donna, Defendants.**

**Criminal No. 07–784 (HAA).**

United States District Court, D. New Jersey.

March 14, 2008.

──────────

Christopher J. Christie, Esq., United States Attorney, Richard E. Constable, III, Esq., Thomas R. Calcagni, Esq., Assistant United States Attorneys, United States Attorney's Office, Newark, NJ, for United States of America.

Ralph J. Lamparello, Esq., Chasan Leyner & Lamparello, Secaucus, NJ, Lawrence S. Lustberg, Esq., Kevin McNulty, Esq., Gibbons P.C., Newark, NJ, for Defendant David Delle Donna.

Brian J. Neary, Esq., Law Offices of Brian J. Neary, Hackensack, NJ, for Defendant Anna Delle Donna.

### OPINION AND ORDER ON PRETRIAL MOTIONS

ACKERMAN, Senior District Judge:

This matter comes before the Court on the joint pretrial motions (Doc. Nos. 13 and 14) filed by Defendants David Delle Donna and Anna Delle Donna, and the Government's motion for reciprocal discovery (Doc. No. 18). Defendants have been charged in a five-count Superceding Indictment ("Indictment") with: conspiracy to commit mail fraud (Count One), in violation of 18 U.S.C. § 1349; substantive mail fraud (Count Two), in violation of 18 U.S.C. §§ 1341, 1346, and 18 U.S.C. § 2; conspiracy to commit extortion under color of official right (Count Three), in violation of the Hobbs Act, 18 U.S.C. § 1951(a); and two counts of filing materially false federal income tax returns (Counts Four and Five), in violation of 26 U.S.C. § 7206(1). In contemplation of the upcoming trial in this matter, Defendants have filed four pretrial motions. Defendants move for:

(1) Dismissal of Counts One and Two (mail fraud conspiracy and mail fraud) of the Indictment for failure to state a legally cognizable offense, pursuant to Federal Rule of Criminal Procedure 12(b)(3);

(2) Severance of Counts Four and Five (false tax returns) from Counts One, Two, and Three (mail fraud and Hobbs Act), pursuant to Federal Rules of Criminal Procedure 8 and 14;

(3) A bill of particulars, pursuant to Federal Rule of Criminal Procedure 7(f); and

(4) Disclosure of Federal Rule of Evidence 404(b) material 30 days before trial.

The Government has opposed Defendants' motions, and has cross-moved for reciprocal discovery pursuant to Federal Rule of Criminal Procedure 16(b)(1)(A). This Court held oral argument on these motions on March 12, 2008.

For the following reasons, Defendants' motions will be DENIED, and the Government's motion for reciprocal discovery will be GRANTED.

### Background

The Indictment in this matter was returned by a Grand Jury on December 13, 2007. The Indictment charges five counts against Defendant David Delle Donna, the Mayor of Guttenberg, New Jersey, and his wife Anna Delle Donna, a former member of the Guttenberg Planning Board. Defendants pled not guilty to all counts of the Indictment on January 3, 2008.[1]

---

1. Defendants dispute the factual allegations of the Indictment but accept them only for the purposes of the instant motion challenging the sufficiency of the Indictment's charges.

David Delle Donna, a member of the Guttenberg Town Council ("Town Council"), began serving as Mayor of Guttenberg on January 1, 2002. His wife Anna was appointed to the Guttenberg Planning Board at the same time that David began his service as Mayor. In their capacities as town officials, the Delle Donnas were in the position to influence official actions taken by the town. According to the Indictment, "defendant DAVID DELLE DONNA operated and caused to be operated certain campaign committees (the 'Committees')" formed to raise funds on behalf of the election campaigns of the Mayor and his affiliated slate of candidates for Town Council, and to defray the expenses of these campaigns. (Indictment, Count One at ¶ 2.) In its response brief, the Government states that "the Delle Donnas" operated the Committees (Gov't Br. at 2), and that Anna Delle Donna served as the treasurer for at least one of the Committees (*id.* at 16, 17).

The Indictment recites relevant applicable New Jersey law regarding campaign contributions and campaign committee reporting requirements. The New Jersey Campaign Contributions and Expenditures Act, N.J. Stat. Ann. §§ 19:44A–1, *et seq.* (the "Campaign Act"), requires the treasurer of a candidate campaign committee to keep an accurate written record of all contributions. The Campaign Act also requires a candidate committee treasurer to report all contributions, and the names and addresses of contributors, to the New Jersey Election Law Enforcement Commission ("ELEC") on forms issued by the ELEC. Only aggregate contributions not exceeding $300 in 2005, or $400 in years prior to 2005, are exempt from reporting requirements. The Campaign Act bars the personal use of campaign contributions, and a recent amendment requires the reporting of any cash contribution, regardless of amount. In addition, the New Jersey Local Government Ethics Law, N.J. Stat. Ann. § 40A:9–22.1, et seq. (the "LGEL"), requires that all local government officials file an annual Financial Disclosure form with the New Jersey Department of Community Affairs, Local Government Services Division, Local Finance Board. This form must list all sources of income, earned or unearned, exceeding $2,000, as well as all gifts having an aggregate value exceeding $400 from a single source, as well as fees and honoraria exceeding $250 from a single source.

In the Indictment's most critical description of the obligations imposed by New Jersey law, it refers to the Campaign Act and its implementing regulations in stating:

> The campaign treasurer and the candidate were under a duty to the campaign committee to, among other things, honestly and truthfully account for the committee's receipts and to not use any of the committee's funds for any improper purpose or expenditure, pursuant to N.J. Stat. Ann. 19:44A–1 *et seq.*, N.J.A.C. 19:25–1.1 *et seq.*, and their common-law obligations as fiduciaries of the committee.

(Indictment, Count One at ¶ 4.) As will be seen, this statement forms the basis for the Government's theory of mail fraud based on the deprivation of the right of honest services.

### I. Conspiracy to Commit Mail Fraud (Count One) and Mail Fraud (Count Two)

The Delle Donnas held two major campaign fundraising events each year (the "Campaign Events") during 2001–2005, the period covered by the Indictment's mail fraud and extortion charges. During the years that David Delle Donna was on the ballot as a candidate for Mayor, proceeds

from tickets sold for Campaign Events were billed as contributions to the joint candidates' committee of David Delle Donna and his affiliated Town Council candidates. In years without a mayoral election, ticket proceeds for Campaign Events were billed as contributions to the joint candidates' committee of Town Council candidates affiliated with the Mayor.

"I–1," as identified in the Indictment, was a Guttenberg property owner and bar operator. From 2001 to 2005, I–1 paid between approximately $2,000 and $6,000 in cash for tickets to various Campaign Events. I–1 also purchased tickets by check during this time. "I–2," a real estate developer identified in the Indictment, hosted a private fundraiser in 2003 or 2004 for David Delle Donna's mayoral campaign. Among the funds collected by I–2 at these events was between approximately $250 and $500 in cash, which I–2 subsequently turned over to David Delle Donna.

In connection with these contributions, the Indictment charges the Delle Donnas with mail fraud and conspiracy to commit mail fraud. It alleges that the Delle Donnas knowingly did, and conspired to, "us[e] the United States mails for the purpose of executing a scheme and artifice to defraud and obtain money and property from the Committees and their contributors and to deprive the Committees of their right to the honest services of their respective treasurers and candidate DAVID DELLE DONNA, by means of materially false and fraudulent pretenses, representations, and promises." (Indictment, Count One at ¶ 8 (conspiracy); *see also* Indictment, Count Two at ¶ 2 (substantive mail fraud).) According to the Indictment, the object of the Defendants' fraudulent scheme was to "divert cash campaign contributions and ticket proceeds from the Committees and to conceal material information regarding this conduct." (Indictment, Count One at ¶ 9.)

In support of the conspiracy, the Indictment alleges that: (1) cash contributions from I–1, I–2, and others were not deposited in the appropriate Committee account but were instead allegedly diverted by Defendants to their personal use; (2) Defendants allegedly conspired to prepare, sign, and use the mails to file ELEC forms that intentionally failed to disclose the cash contributions despite being certified by Committee treasurers to be truthful and accurate; and (3) Defendants conspired to prepare, sign, and use the mails to file, pursuant to the LGEL, false Financial Disclosure forms that failed to disclose the cash contributions.

The Indictment relies on the allegations of Count One in charging substantive mail fraud in Count Two, predicated on the Defendants' use of the mails to file a March 3, 2003 LGEL Financial Disclosure Statement for 2002 with the New Jersey Department of Community Affairs. The LGEL form "intentionally failed to disclose approximately $5,000 in cash campaign contributions that [Defendants] had diverted." (Indictment, Count Two at ¶ 3.)

## II. Conspiracy to Commit Extortion (Count Three)

Count Three of the Indictment charges Defendants with "knowingly and willfully conspir[ing] and agree[ing] with each other and others to obstruct, delay, and affect interstate commerce by extortion under color of official right, by obtaining corrupt payments that were paid by I–1, with I–1's consent." (Indictment, Count Three at ¶ 2.) According to the Indictment, Defendants agreed to obtain money from I–1 "with the intent to be influenced and rewarded for taking, attempting to take, and refraining from taking official action in their positions as Guttenberg officials."

(*Id.*, Count Three at ¶ 3.) The Indictment lists a series of cash, goods, and services that Defendants solicited and accepted from I–1. These include:

1) approximately $2,000 in cash for cosmetic surgery for Anna;

2) several thousand dollars in cash for Anna to use for gambling in casinos in Atlantic City and elsewhere;

3) approximately $1,000 in department store gift cards;

4) bottles of liquor, including bottles of Grand Marnier, from I–1's bar business;

5) over $1,700 for the purchase of "a dog and related accessories"; and

6) approximately $1,115 in "campaign related clothing" for David's 2003 mayoral campaign.

(Indictment, Count Three at ¶ 4(b)(i)-(vi).) In exchange for these contributions, Defendants agreed to take and refrain from taking official action on behalf of Guttenberg with regard to the following issues, among others:

1) problems I–1 was having with the Guttenberg Township Council, the town's Alcoholic Beverage Commission, concerning "incidents at I–1's bar business";

2) I–1's attempt to obtain construction permits and approvals regarding properties in Guttenberg and elsewhere; and

3) multiple citations received by I–1 for "various municipal violations involving I–1's Guttenberg properties, including the proper disposal and storage of garbage."

(Indictment, Count Three at ¶ 4(c)(i)-(iii).)

### III. Filing Materially False Income Tax Returns (Counts Four and Five)

Counts Four and Five of the Indictment charge Defendants with filing materially false income tax returns for 2004 and 2005, respectively. With regard to the 2004 return (Count Four), the Indictment alleges that the Defendants failed to report "rental income of approximately $9,505 that [Defendants] received in 2004 from approximately five tenants that rented apartments from [Defendants]." (Indictment, Count Four at ¶ 4.) For the 2005 return (Count Five), the Indictment contends that Defendants failed to report approximately $16,037 in rental income, *and* corrupt payments from I–1, as alleged in Count Three, of approximately $2,000 for Anna's cosmetic surgery and approximately $1,700 for Anna's dog and related accessories.

### IV. Pretrial Motions

Trial in this matter is scheduled to begin on March 18, 2008. In response to a defense request for an extension on the pretrial briefing schedule, this Court ordered on February 4, 2008 that all pretrial motions be filed no later than February 8, 2008. In compliance with this Order, counsel for Defendant David Delle Donna filed an omnibus pretrial motion on February 8, 2008. By letter dated February 11, 2008, counsel for Defendant Anna Delle Donna joined David Delle Donna's motion. Anna Delle Donna did not join in David Delle Donna's motion until the Monday after the Friday motion deadline. The Court will exercise its discretion to consider Anna Delle Donna's motion and will apply the Court's resolution of the motions to both Defendants. However, this Court is disappointed with Anna's counsel's failure to adhere to the Court's scheduling order, and expects strict adherence to all Court orders in the future. Furthermore, counsel for Defendant David Delle Donna timely filed a reply brief on the instant motions on February 29, 2008. Counsel for Defendant Anna Delle Donna has not

formally joined in this reply brief. The Court assumes that Anna Delle Donna joins in the reply arguments made by her husband, as they apply equally to both Defendants, but requests that any future joint filings by Defendants be specifically identified as such by all counsel.

## Analysis

### I. Defendants' Motion to Dismiss the Mail Fraud Counts (Counts One and Two)

#### A. *Rule 12(b)(3) Standard*

Defendants move to dismiss Counts One and Two of the Indictment, the mail fraud counts, pursuant to Federal Rule of Criminal Procedure 12(b)(3). Rule 12(b)(3) allows a defendant to move to dismiss an indictment at any time for failure to state an offense. Rule 7(c)(1) requires that an indictment contain only a "plain, concise, and written statement of the essential facts constituting the offense charged" and include the statute(s) that the defendant(s) are alleged to have violated. The Supreme Court of the United States has held generally that "an indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or a conviction in bar of future prosecutions for the same offense." *Hamling v. United States*, 418 U.S. 87, 117, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974); *see also United States v. Kemp*, 500 F.3d 257, 280 (3d Cir.2007); *Gov't of Virgin Islands v. Moolenaar*, 133 F.3d 246, 248 (3d Cir. 1998).

■ The Court's analysis under Rule 12(b)(3) depends upon the *allegations* of the indictment because "at this stage of the proceedings the indictment must be tested by its sufficiency to charge an offense" rather than by whether the "charges have been established by the evidence." *United States v. Sampson*, 371 U.S. 75, 76, 78–79, 83 S.Ct. 173, 9 L.Ed.2d 136 (1962). Thus, for purposes of this motion, this Court must accept as true all of the factual allegations in the Indictment, *United States v. Besmajian*, 910 F.2d 1153, 1154 (3d Cir.1990), and dismissal under Rule 12(b)(3) "may not be predicated upon the insufficiency of the evidence to prove the indictment's charges," *United States v. DeLaurentis*, 230 F.3d 659, 661 (3d Cir.2000); *see also United States v. Gallagher*, 602 F.2d 1139, 1142 (3d Cir. 1979) (holding that "evidentiary questions should not be determined" on motion to dismiss indictment). This Court will review the Indictment "using a common sense construction." *United States v. Hodge*, 211 F.3d 74, 76 (3d Cir.2000) (citing *Moolenaar*, 133 F.3d at 250).

■ The Third Circuit has stated that " 'no greater specificity than the statutory language is required so long as there is sufficient factual orientation to permit the defendant to prepare his defense and to invoke double jeopardy in the event of a subsequent prosecution.' " *Kemp*, 500 F.3d at 280 (quoting *United States v. Rankin*, 870 F.2d 109, 112 (3d Cir.1989)). It is not enough, however, for the Indictment merely to "recite[ ] in general terms the essential elements of the offense, even if the specific facts alleged in the charging instrument fail to satisfy those elements." *United States v. Panarella*, 277 F.3d 678, 685 (3d Cir.2002). "An indictment must allege more than just the essential elements of the offense." *United States v. Vitillo*, 490 F.3d 314, 321 (3d Cir.2007) (citing *Panarella*, 277 F.3d at 685). Rather, the Third Circuit has held that "for purposes of Rule 12(b)(2) [later superceded by Rule 12(b)(3)], a charging document fails to state an offense if the specific facts alleged in the charging document fall beyond the scope of the relevant criminal

statute, as a matter of statutory interpretation." *Panarella,* 277 F.3d at 685. Therefore, this Court must examine the mail fraud statutes as applied to the facts as alleged in the Indictment, and determine whether Defendants' conduct, as charged, "reflect[s] a proper interpretation of criminal activity under the relevant criminal statute[s]." *United States v. Wecht,* No. 06–0026, 2007 WL 3125096, at *5 (W.D.Pa. Oct.24, 2007).

### B. The Mail Fraud Statutes

The mail fraud statute, 18 U.S.C. § 1341, provides:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises . . ., for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service . . ., shall be fined under this title or imprisoned not more than 20 years, or both.

18 U.S.C. § 1341. Defendants are charged both with substantive mail fraud pursuant to § 1341 and conspiracy to commit mail fraud in violation of 18 U.S.C. § 1349, which provides that "[a]ny person who attempts or conspires to commit any offense under this chapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy." Defendants do not raise any separate challenges to the conspiracy portion of the mail fraud charges, and only attack the underlying mail fraud charges.

Section 1346 further defines the meaning of the term "scheme or artifice to defraud" as including "a scheme or artifice to deprive another of the intangible right of honest services." 18 U.S.C. § 1346. Thus, the mail fraud statutes offer two overarching theories for criminal liability: (1) a scheme or artifice for *obtaining money or property* by false or fraudulent pretenses, representations, or promises, 18 U.S.C. § 1341; and (2) a scheme or artifice to *deprive another of the right of honest services,* 18 U.S.C. §§ 1341, 1346.

In addition to "the existence of a scheme to defraud" under one of these theories, the substantive elements of mail fraud pursuant to § 1341 are "the use of the mails—whether the United States Postal Service or a private carrier—in furtherance of the fraudulent scheme," and "culpable participation by the defendant, that is, participation by the defendant with specific intent to defraud." *United States v. Dobson,* 419 F.3d 231, 238 (3d Cir.2005); *see also United States v. Kemp,* 500 F.3d 257, 279 (3d Cir.2007) (holding that mail fraud elements include "(1) the defendant's knowing and willful participation in a scheme or artifice to defraud, (2) with the specific intent to defraud, and (3) the use of the mails . . . in furtherance of the scheme.") (quoting *United States v. Antico,* 275 F.3d 245, 261 (3d Cir.2001)). The Indictment also charges Defendants under 18 U.S.C. § 2.[2]

Defendants only challenge the sufficiency of the Indictment as to the first element of mail fraud: the existence of a scheme to

---

**2.** Section 2 provides:
(a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.

(b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal. 18 U.S.C. § 2.

defraud. The Indictment charges a scheme to defraud based on both the "money or property" and "honest services" theories. It alleges that Defendants conspired to and did in fact use the United States mails for the purpose of executing a scheme and artifice to defraud and: (1) "to obtain money and property from the Committees and their contributors"; and (2) "to deprive the Committees of their right to the honest services of their respective treasurers and candidate DAVID DELLE DONNA." (Indictment, Count One at ¶ 8; Count Two at ¶ 2.) At the outset, the Court observes that the Indictment sufficiently alleges the essential elements of mail fraud. Defendants argue that the facts pled in the Indictment do not constitute mail fraud as defined by the statutes and caselaw, and specifically that the facts pled do not make out either "money or property" mail fraud or "honest services" mail fraud. The Court will examine each theory of criminal liability in turn.

### C. The Indictment Sufficiently Alleges That Defendants Defrauded the Committees of Money

█ To charge mail fraud on a theory of a scheme to defraud of money or property, "the object of the alleged scheme or artifice to defraud must be a traditionally recognized property right." *United States v. Hedaithy*, 392 F.3d 580, 590 (3d Cir. 2004) (citing *United States v. Henry*, 29 F.3d 112, 115 (3d Cir.1994)). Here, the Indictment alleges that the object of Defendants' conspiracy and scheme was for Defendants to obtain "cash campaign contributions and ticket proceeds." (Indictment, Count One at ¶ 9.) Defendants do

not contest the sufficiency of this allegation, but rather target what they see as the Indictment's failure to adequately allege that this money was fraudulently obtained.

Defendants contend that while "the Indictment charges that certain persons parted with money," it fails to allege that "anyone was defrauded of money." (Defs.' Br. at 7.) Defendants focus their argument on the notion that I–1 and I–2 were not *defrauded* of money because they gave money willingly, "intending that David Delle Donna receive the cash and hoping to receive political favors in return." (*Id.*) Indeed, as Defendants claim, some of I–1's payments implicated in Count One appear to form the basis of Count Three's extortion count, and thus are alleged to be bribes. I–2 collected cash from others which he presumably also intended to serve as a bribe. While I–1 and I–2 themselves might not have been defrauded, however, Defendants miss the mark entirely in contending that the Indictment fails to allege sufficiently that the *Committees* were not defrauded of money. The Indictment bases its money and property mail fraud theory on the allegation that money was fraudulently taken from the Committees, not just from I–1 and I–2.[3]

In describing the Campaign Events, the Indictment states that tickets to such events in mayoral election years "were sold as contributions to the joint candidates committee of defendant DAVID DELLE DONNA" and the Town Council candidates affiliated with the Mayor, and that tickets for events in non-mayoral election years were "sold as contributions to

---

**3.** The Government mentions in its brief that I–1 and I–2 are "expected" to "state that they understood that their cash contributions would be used to defray campaign-related expenses—so they were not knowing participants with the defendants in the conduct charged in Counts One and Two." (Gov't Br. at 13.) The Indictment sufficiently alleges that Defendants defrauded the Committees of money and need not be supplemented with this hint regarding potential upcoming proofs at trial.

the joint candidates committee" of the Town Council candidates affiliated with the Mayor. (Indictment, Count One at ¶ 6.) Defendants ignore the Indictment's crucial allegation that the tickets "were sold as contributions" to the Committees. I–1, according to the Indictment, "spent between approximately $2,000 and $6,000 in cash *on tickets for each Campaign Event*" and also bought tickets by check during the relevant time period. (Indictment, Count One at ¶ 7(a) (emphasis added).)

■ Thus, Defendants' argument that the "Committees did not receive, and were never intended to receive, these cash payments" misreads the Indictment, as does Defendants' contention that the Indictment fails to allege that "the Committee had 'property rights' in these payments." (Defs.' Br. at 8, 9.) The Indictment indeed does not state specifically that the Committees had "property rights" in the funds used to purchase Campaign Event tickets, but taking the allegations of the Indictment as true, it alleges that the tickets were "sold as contributions to the joint candidates committee." (Indictment, Count One at ¶ 6.) On a common sense reading of the Indictment, Defendants fraudulently subverted these funds designated for the Committees—whatever the intentions of the contributors—to Defendants' personal use. Defendants rightly assert that "the characterization of these payments as campaign donations was a cover story used by the donor and recipient to justify what were in reality personal payments." (Defs.' Br. at 8.) However, I–1 purchased tickets which were expressly designated as contributions to the Committees, and even if I–1 ultimately intended that Defendants pocket the money themselves, such intent does not alter the fact that, as alleged, the ticket proceeds were effectively the property of the Committees. Use of the mails by Defendants to effectu-

ate this fraudulent scheme to obtain money from the Committees constitutes mail fraud. *See United States v. Curry,* 681 F.2d 406, 411 (5th Cir.1982) (holding that indictment alleged sufficient theory of mail fraud in charging that chairman of political committee used the mails to conceal a "scheme to defraud [the committee] of funds collected from political candidates by converting these funds to his own use").

Defendants offer an analogy that illustrates the logical flaw in their analysis:

> Assume, for example, that Sister gave Cousin a gift of $100, a transaction witnessed by Brother, who received nothing. To disguise this favoritism, Sister made a show of telling Cousin that the $100 should be used to repay a debt to Grandmother. Brother, later discovering that this was untrue, could claim to have been misled. Grandmother, however, was not "defrauded" of $100.

(Defs.' Br. at 8 n.6.) The facts as alleged in the Indictment differ markedly from this tale of familial deceit. I–1 ("Sister") did not merely make a show of giving David Delle Donna ("Cousin") a "gift" that was publicly intended for some non-existent debt to the Committees ("Grandmother") yet privately intended for David Delle Donna personally. I–1 did in fact owe a debt to the Committees: the Campaign Event tickets were expressly sold as contributions to the Committees, and I–1 purchased these tickets. By allegedly diverting this money from the Committees, Defendants defrauded the Committees. Furthermore, while New Jersey law, thankfully, does not regulate the manner in which hostile family members lie to each other, New Jersey law in fact governs contributions to a campaign committee and the reporting of such contributions. The Campaign Events were presumably structured to comply with New

Jersey law by designating ticket proceeds to the Committees, and Defendants here are charged with using the mails in a scheme to subvert this law and rob the Committees of funds denominated to it. Defendants' tortured analogy fails, and the Indictment sufficiently alleges "money or property" mail fraud.

The parties draw no distinction between the contributions of I–1 and I–2, but the mail fraud allegations with regard to I–2 merit further consideration. As discussed, the Indictment charges I–1 with making contributions by way of Campaign Event ticket purchases. The Indictment alleges that I–2, rather than buy Campaign Event tickets, "hosted a private fundraiser" for the Delle Donna mayoral campaign. (Indictment, Count One at ¶ 7(b).) I–2 collected between $250 and $500 in cash from "the guests" at this fundraiser, and turned this cash over to Defendant David Delle Donna. (*Id.*) The Indictment does not allege specifically that I–2's "private fundraiser" was a *Committee* Campaign Event or that tickets to this event were sold as contributions to a Committee.

■ However, the Indictment states that Defendants' mail fraud conspiracy sought to "divert and attempt to divert *cash campaign contributions* and ticket proceeds from the Committees." (Indictment, Count One at ¶ 9 (emphasis added).) Thus, the Indictment alleges that even the cash campaign contributions were desig-

nated for the Committees. Indeed, New Jersey election law channels candidate fundraising and spending through candidate committees rather than through the candidate himself or herself, and generally bars the use of campaign contributions for personal use by a candidate or anyone else.[4] Thus, accepting as true the Indictment's factual allegations, Defendants' charged diversion of I–2's contributions to their personal use defrauded the Committee of cash designated to it.

■ In addition, the Indictment charges that Defendants fraudulently obtained money and property from the "Committees and *their contributors.*" (Indictment, Count One at ¶ 8 (emphasis added); Count Two at ¶ 2 (emphasis added).) I–2 did not make contributions on his/her own behalf. Rather, according to the Indictment, "[a]mong the funds collected from the guests, I–2 received between approximately $250 and $500 in cash, which I–2 subsequently turned over to defendant DAVID DELLE DONNA." (Indictment, Count One at ¶ 7(b).) Presumably, individual guests at I–2's private fundraiser might have intended their contributions as legitimate donations to David Delle Donna's mayoral campaign Committee, and not as bribes to be pocketed directly by Defendants. Even if the individual guests did not have this intention, the Indictment sufficiently charges that the money they con-

---

4. *See, e.g.,* N.J. Stat. Ann. § 19:44A–9 ("[E]ach candidate . . . shall, no later than the date on which that candidate first receives any contribution or makes or incurs any expenditures in connection with an election, establish (1) a candidate committee, (2) a joint candidates committee, or (3) both, for the purpose of receiving contributions and making expenditures."); N.J. Admin. Code § 19:25–6.5(a), (b) (stating that all contributions received by a candidate or candidate committee generally be used only for, *inter alia,* "campaign expenses," defined as "ex-

pense incurred or expenditure made by a candidate [or] candidate committee . . . from a campaign or organizational depository account.") N.J. Admin. Code § 19:25–6.5(a), (c) (excluding use of contributions for "personal use" from definition of "campaign expenses" for which contributions may permissibly be used); N.J. Admin. Code § 19:25–6.4(b) ("Any expenditure by a candidate in the furtherance of his or her candidacy . . . shall be made from the organizational or campaign depository established by the committee.").

tributed was in fact designated to the campaign Committees. In other words, the Indictment satisfactorily *alleges* a theory that Defendants fraudulently subverted cash donated by guests and bundled by I–2 to their personal use, and thereby "obtained money and property from the Committees and their contributors." (Indictment, Count One at ¶ 8; Count Two at ¶ 2.) Whether the Government may prove this particular offense beyond a reasonable doubt is not the proper focus of a Rule 12 motion. Accepting the Indictment's allegations as true, as this Court must, this theory of mail fraud is sufficiently alleged.

Finally, Defendants argue that the Indictment does not allege "factually that the campaign committees were *defrauded* of the I–1 and I–2 payments" because if the Committees and/or their treasurers were complicit in or knew of the alleged scheme, they were not "defrauded." (Defs.' Reply Br. at 4.) However, as Defendants concede, "the Indictment does not allege that the Committees or their treasurers had knowledge of the charged scheme." (Defs.' Br. at 8.) Section 1341 criminalizes a scheme "for obtaining money or property by means of false or fraudulent pretenses, representations, or promises." The Indictment alleges that Defendants subverted money from the Committees under false and fraudulent pretenses, and charges that they concealed their activities from the Committees through false representations in Committee and personal reports to state agencies. These allegations are sufficient to charge Defendants with a fraudulent scheme to obtain money, and fairly informs Defendants of the nature of the charged fraud against which they must defend. *See Hamling,* 418 U.S. at 117, 94 S.Ct. 2887. Defendants' challenge to the fraudulent character of the charged scheme amounts to a proof question: whether the Government may prove at trial, beyond a reasonable doubt, that the Committees were defrauded.[5] Such proof questions may not be considered at this stage.

For these reasons, Counts One and Two state valid offenses against both Defendants of conspiracy to commit mail fraud and mail fraud based on a money or property theory.

---

**5.** Defendants seize on the Government's representation that some Committee treasurers, including Defendant Anna Delle Donna herself, were aware of the scheme to defraud. (Gov't Br. at 17 ("[C]ertain treasurers knew that contributors were issuing cash contributions to the committees that were not being placed in the committee bank accounts, not being used for proper purposes, and not being recorded on the reports.").) The Indictment does not contain this factual allegation, and the Court therefore presumes that the Government's proofs at trial might include evidence of this allegation. Defendants suggest that the Government, in proffering this evidentiary prediction to bolster its argument with regard to the honest services theory, contradicts its case for the money or property theory. They contend that the Government cannot allege both that the treasurers were "in on" the fraud such that they knowingly failed to provide their honest services to the Committees, *and* that they were defrauded of money because they were *not* "in on" the scheme. (Defs.' Reply Br. at 4, 13.)

Defendants' argument is misplaced. While facially appearing perhaps to contradict itself, the Government nonetheless contends, as a matter of law, that the treasurers need not have been "in on" the breach of duty of honest services for Defendants to have committed mail fraud under an honest services theory. (Gov't Br. at 17–18.) Thus, the Government's depiction of the treasurers' and the Committees' state of mind do not fatally conflict with each other. Furthermore, this Court must primarily assess the Indictment's factual allegations and legal theories at this stage, and need not concern itself with the way in which the Government will provide proof of the various factual elements of mail fraud beyond ensuring that the factual allegations of the Indictment fall within the scope of the mail fraud statute.

#### D. The Indictment Alleges a Legally Sufficient Theory of Honest Services Mail Fraud

The Indictment also pursues an "honest services" theory of mail fraud against Defendants pursuant to 18 U.S.C. § 1346. The Indictment charges Defendants with conspiring to and in fact depriving "the Committees of their right to the honest services of their respective treasurers and candidate DAVID DELLE DONNA." (Indictment, Count One at ¶ 8; Count Two at ¶ 2.)

As noted above, the mail fraud statute requires a scheme or artifice to defraud, and § 1346 defines "scheme or artifice to defraud" as including "a scheme or artifice to deprive another of the intangible right of honest services." 18 U.S.C. § 1346. "Congress enacted § 1346 in response to the Supreme Court's decision in *McNally v. United States*, 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987), which overturned a long line of lower court decisions and held that the mail and wire fraud statutes did not reach schemes to defraud citizens of their intangible right to a public official's honest services, but rather were 'limited in scope to the protection of property rights.'" *United States v. Panarella*, 277 F.3d 678, 690 (3d Cir.2002) (quoting *McNally*, 483 U.S. at 360, 107 S.Ct. 2875).[6]

In these cases, as well as many of the honest services fraud cases from courts in our Circuit, the honest services at issue were those owed by a public official to the public or to the citizenry. The defendant in *Antico* held various positions in the Department of Licenses and Inspections of the City of Philadelphia and, because he failed to disclose his personal interest in certain matters over which he had authority, was charged with depriving the public of its right to disinterested decision-making and to full disclosure of the potential motivation for his decisions. *Antico*, 275 F.3d at 249, 262. The Government charged the defendant in *Panarella*, the private owner of a tax collection business, with being an accessory after the fact to a fraudulent scheme to deprive the public of the honest services of a Pennsylvania state senator. *Panarella*, 277 F.3d at 681, 689.[7] Defendant in *Murphy* was a former New Jersey political party county chairman charged under two theories of honest services mail fraud: a scheme to defraud the people of the county of the honest services of the county commissioner, and a scheme to defraud the people of the county of his own honest services. *United States v. Murphy*, 323 F.3d 102, 109 (3d Cir.2003).

In the instant case, however, the Government expressly does not charge a theory of deprivation of honest services to the public by Defendants in their capacity as public officials. At oral argument, counsel for the Government represented that the Government "purposefully" did not charge this type of honest services violation against Defendants, the mayor of Guttenberg and a member, at the time charged in the Indictment, of the Guttenberg Planning Board. As stated

---

**6.** *Panarella* instructs that in interpreting § 1346, this Court must "look to both post-*McNally* cases interpreting § 1346 and pre-*McNally* cases interpreting § 1341 and § 1343 for guidance." *Panarella*, 277 F.3d at 690. Thus, this Court will consider pre-*McNally* precedent where appropriate.

**7.** The indictment in *Panarella* alleged that the state senator failed to disclose income he had received from the defendant and that defendant assisted the public official in concealing their financial relationship. Thus, to determine the sufficiency of the honest services fraud charge, the Third Circuit focused on whether the facts alleged in the indictment established that the state senator committed honest services wire fraud, even though the defendant himself was not a public official.

in the Government's brief, "the honest services component here is not predicated on the defendants' (or anyone's) duties as local government officials." (Gov't Br. at 14.) Rather, the Indictment alleges that Defendants schemed to deprive the *campaign Committees* of the honest services of their respective *treasurers* and of *candidate* David Delle Donna. According to the Government's brief, "the honest services component is predicated on candidate David Delle Donna's and the treasurers' duties as fiduciaries to the committees." (*Id.*)

The Government analogizes this case to one of private fraud between an agent and his or her principal, and alleges in the Indictment that the candidate and treasurer have common-law and statutory-based fiduciary duties to a campaign committee of honesty, non-embezzlement, and accurate accounting. The Third Circuit in *Antico* stated that the honest services doctrine "reaches public *and private fraud* at the state and local levels" and thus acknowledged that the scope of honest services could extend beyond public corruption. *Antico*, 275 F.3d at 261 (emphasis added). Defendants argue that no matter how the Government labels this case, it is one involving alleged political corruption and must fall under the analysis of *Panarella*. With regard to public officials, *Panarella* stated that "[h]onest services fraud typically occurs in two scenarios: (1) bribery, where a legislator was paid for a particular decision or action; or (2) failure to disclose a conflict of interest resulting in personal gain." *Panarella*, 277 F.3d at 690 (quoting *United States v. Antico*, 275 F.3d 245, 262 (3d Cir.2001)). Defendants contend that *Panarella* limits the permissible theories of honest services fraud to the two types discussed in *Antico* and *Panarella*—bribery and failure to disclose a conflict of interest—and that neither theory covers the alleged deprivation of honest services factually alleged in the Indictment.

This Court disagrees with Defendants that *Antico* and its progeny set forth the *exclusive* types of legally valid honest services charges. Our Court of Appeals held in *Panarella* that "[h]onest services fraud *typically* occurs" in these two instances. *Panarella*, 277 F.3d at 690 (quoting *Antico*, 275 F.3d at 262) (emphasis added). While these two scenarios are the most *typical*, the Third Circuit has never held that they are the *only* circumstances under which honest services fraud may occur. Furthermore, the Third Circuit honest services cases deal with deprivation of honest services to the public, and thus depend on the types of state-created fiduciary duties owed to the public. Here, Defendants are charged with scheming to deprive the Committees of the honest services of the Committees' fiduciaries, and thus the types of breaches sufficient to support an honest services prosecution may include more than solely bribery or failure to disclose. The reference in *Antico* to "private fraud" acknowledges that the scope of honest services could extend beyond public corruption and the most "typical" scenarios. *Antico*, 275 F.3d at 261.

The Government, as a matter of law, argues that the limitations of *Panarella* and similar cases do not apply here because Defendants are charged as private actors who schemed to deprive the Committees, not the public, of honest services owed to it by candidate David Delle Donna and the treasurers. In so doing, the Government contends that common law principles of fiduciary duty between an agent and principal, coupled with New Jersey election law that imposes certain obligations on candidates, committees, and committee treasurers, support the honest services charge.

This case thus fits into the context of private honest services fraud recognized by our Circuit and other Circuits. As noted, the Third Circuit in *Antico* stated that the honest services doctrine "reaches public *and private fraud* at the state and local levels." *Antico,* 275 F.3d at 261 (emphasis added). Other courts have held the same more clearly. For example, the Ninth Circuit has concluded that "[n]either the words of § 1346 nor its context suggests the public-corruption-only limitation for which Defendant[s] argues. Section 1346 refers, without limitation, to 'the intangible right of honest services,' and sections 1341 and 1343 contain no special reference to public corruption." *United States v. Williams,* 441 F.3d 716, 722 (9th Cir.2006) (applying § 1346 in a private commercial setting). The Ninth Circuit in *Williams* held that honest services fraud applies where "the defendant has a fiduciary duty to the victim." *Id.* at 718. In so finding, the Ninth Circuit joined several other Courts of Appeals. *See, e.g., United States v. Vinyard,* 266 F.3d 320, 326 (4th Cir.2001) ("Although the honest services theory of mail fraud is directed primarily at the deterrence and punishment of corruption among public officials, the courts have consistently recognized the statute's province to encompass dishonest acts perpetrated in private commercial settings."); *id.* at 327–28 (collecting cases from other circuits); *United States v. de-Vegter,* 198 F.3d 1324, 1330–31 & n. 7 (11th Cir.1999) (recognizing that breach of fiduciary duty accompanied by reasonable foreseeable economic harm, in the private sector context, amounts to a § 1346 violation); *United States v. Sun–Diamond Growers of Calif.,* 138 F.3d 961, 973 (D.C.Cir.1998) (same); *United States v. Frost,* 125 F.3d 346, 366 (6th Cir.1997) (holding that "private individuals ... may commit mail fraud by breaching a fiduciary duty and thereby depriving the person or

entity to which the duty is owed of the intangible right to the honest services of that individual"). The Second Circuit has held:

> [W]e conclude from the cases in the various circuits that had employed an 'honest services' theory prior to Congress's enactment of section 1346 that the term' scheme or artifice to deprive another of the intangible right to honest services' in section 1346, when applied to private actors, means a scheme or artifice to use the mails or wires to enable an officer or employee of a private entity (or a person in a relationship that gives rise to a duty of loyalty comparable to that owed by employees to employers) purporting to act for and in the interests of his or her employer (or of the other person to whom the duty of loyalty is owed) secretly to act in his or her or the defendant's own interests instead, accompanied by a material misrepresentation made or omission of information disclosed to the employer or other person. As noted, in self-dealing cases, unlike bribery or kickback cases, there may also be a requirement of proof that the conflict caused, or at least was capable of causing, some detriment.

*United States v. Rybicki,* 354 F.3d 124, 141–42 (2d Cir.2003) (en banc) (footnote omitted). The court saw "no reason" why this fiduciary duty form of honest services fraud would apply not just to employees but also to "other persons who assume a legal duty of loyalty comparable to that owed by an officer or employee to a private entity." *Id.* at 142 n. 17.

The Third Circuit recognizes that the honest services doctrine extends beyond solely public corruption, and applies to other areas where a fiduciary duty may be found. For example, in *United States v.*

*Boffa,* the court affirmed a theory of honest services mail fraud based on an established fiduciary duty, under federal labor law, of labor union officials to union members. 688 F.2d 919, 930–31 (3d Cir.1982).

In *United States v. Caruso,* this Court itself addressed this issue. In *Caruso,* this Court sustained the sufficiency of an honest services mail fraud charge against an accounting firm partner accused of scheming to defraud his accounting firm via firm-reimbursed charitable donations to Seton Hall University that the defendant later revoked without returning the reimbursement to his firm. The Government contended that the defendant engaged in a scheme to defraud his accounting firm of his honest services, and this Court found this theory to be legally valid under § 1346. *Id.* at 387–88. The defendant in *Caruso* argued that the federal prosecution must fail because defendant's conduct was not illegal under state law. This Court rejected the defendant's argument. *Caruso* stands for the rule that private fraud, such as that between a partner and his partnership, falls within the scope of honest services fraud. Moreover, this Court held in *Caruso* that the underlying conduct need not be criminalized by the state to serve as the basis for a federal mail fraud prosecution, *id.* at 388, and the Third Circuit has expressly declined to hold to the contrary, *see Murphy,* 323 F.3d at 117; *Panarella,* 277 F.3d at 699 n. 9 (discussing *Antico* ).

Although not cited by the parties, *United States v. D'Alessio* also involves a candidate's duties to a campaign committee. In *D'Alessio,* Judge Sarokin considered whether honest services fraud may be charged against a candidate for public office and a treasurer of the candidate's campaign fund. 822 F.Supp. 1134 (D.N.J. 1993). The court ultimately agreed with the Government's position that "candidates owe a duty of honesty to their campaign fund, the fund's contributors, the fund's creditors, and the public." *Id.* at 1148.

The Indictment here sufficiently alleges a statutory and common law basis for the duties of the candidate and treasurer to a campaign committee. This approach is consistent with *Caruso,* where this Court observed that applicable state partnership law proscribed the conduct at issue. *United States v. Caruso,* 948 F.Supp. 382, 387 & n. 1 (D.N.J.1996) (citing N.Y. Partnership Law § 51(1) & (2)). Similarly, in *D'Alessio,* the court recited lengthy portions of the indictment which, citing some of the New Jersey provisions invoked in this case, outlined the duties owed by a candidate and treasurer, including their duties to honestly use and report campaign expenses and to not convert campaign contributions to personal use. *D'Alessio,* 822 F.Supp. at 1146.

The Indictment in this matter reviews the obligations imposed on candidates, campaign committees, and campaign committee treasurers by New Jersey law, specifically the Campaign Act, the LGEL, and various New Jersey regulations implementing these laws. (Indictment, Count One at ¶¶ 3–5, 12.) Based on these provisions, the Indictment charges that a committee treasurer and a candidate have a duty to the committee to "among other things, honestly and truthfully account for the committee's receipts and not use any of the committee's funds for any improper purpose or expenditure, pursuant to N.J. Stat. Ann. 19:44A–1 *et seq.,* N.J.A.C. 19:25–1.1 *et seq.,* and their common-law obligations as fiduciaries of the committee." (Indictment, Count One at ¶ 4.) In this allegation, the Indictment cites to established statutory, regulatory, and common law bases for the duties alleged to be deprived of the Committees here.

In its brief, the Government states that Counts One and Two "involve the following honest services violations:

(1) David Delia Donna as a candidate (a) endeavored to divert cash contributions from his committees and (b) failed to disclose material information regarding that diversion to the particular committees relating to his candidacy; (2) Anna Delia Donna as a treasurer (a) endeavored to divert cash contributions from the particular committees where she served as a treasurer and (b) failed to disclose material information regarding that diversion to these committees relating to his candidacy; and (3) the defendants caused treasurers of certain of the committees to fail to disclose material information to the committees regarding the diversion of cash contributions from the committees.

(Gov't Br. at 16–17.) [8]

The Indictment relies in part on established common law principles of fiduciary duty between an agent (such as a candidate and treasurer) to his or her principal (a campaign committee). *See, e.g., N.L.R.B. v. Sheet Metal Workers' Intern. Ass'n, Local Union No. 19,* 154 F.3d 137, 143 (3d Cir.1998) (quoting Restatement (Second) of Agency § 1(1) (1958), which provides that "[a]gency is the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other to act"). The Government also sets forth, in a footnote to its brief, the codification in New Jersey law of "aspects of the candidate's and treasurer's obligations in its election statutes and regulations." (Gov't Br. at 16 n. 7.) The Government lists the following:

* all contributions received by a candidate or committee were to be used for proper purposes and not personal expenses, *see* N.J. Stat. Ann. Section 19:44A–11.2; N.J. Admin. Code Section 19:25–6.5.

* each candidate and campaign treasurer was required to certify the correctness of each report of contributions and expenditures filed by the particular committee with ELEC, *see* N.J. Stat. Ann. Section 19:44A–9(d).

* each treasurer of a committee was required to make a written record of all funds which the treasurer received as contributions to the committee. The treasurer was required to keep those records for 4 years. The Treasurer was further required to deposit those funds in the committee's authorized depository (a bank account), or to transfer such funds to another committee. *See* N.J. Stat. Ann. Section 19:44A–12; NJ. Admin. Code, Sections 19:25–6.1, –6.2, –7.1, –7.3.

8. At oral argument, the Court raised the issue of whether the Indictment pled that Anna Delle Donna was a treasurer of at least one of the Committees. While the Indictment does not allege that Anna Delle Donna was a treasurer in so many words, the Indictment does state that Anna Delle Donna, with her husband, prepared and signed ELEC and LGEL forms. (Indictment, Count One at ¶¶ 11–12.) The Indictment also alleges that Anna Delle Donna diverted campaign contributions from the Committees. (Indictment, Count One at ¶¶ 9, 10.) These allegations suffice to state an offense of honest services fraud and put Anna Delle Donna on notice as to the charge against her. The Indictment sufficiently notifies Anna Delle Donna that she is charged with conspiring with her husband to divert funds from the Committees and failing to disclose information to the Committees in breach of David Delle Donna's duty of honest services. Therefore, the fact of Anna Delle Donna's status as treasurer need not have been specifically alleged in the indictment, and is more properly seen as a proof issue at trial.

\* the treasurer also was required to make and maintain a written record of all expenditures. *See* N.J. Admin. Code, Section 19:25–12.2.

\* the candidate was required to take all necessary steps to ensure that proper records were maintained. *See* N.J. Admin. Code, Section 19:25–7.1(d).

(Gov't Br. at 16 n.7.) The Indictment states that a committee treasurer and a candidate have a duty to the committee to "among other things, honestly and truthfully account for the committee's receipts and not use any of the committee's funds for any improper purpose or expenditure, pursuant to N.J. Stat. Ann. 19:44A–1 *et seq.*, N.J.A.C. 19:25–1.1 *et seq.*, and their common-law obligations as fiduciaries of the committee." (Indictment, Count One at ¶ 4.) The statutory and regulatory provisions cited above are specifically referenced in this portion of the Indictment and comprise part of the basis for the alleged fiduciary duty here.

Some provisions, in particular, appear to establish the requisite fiduciary duty. *See, e.g.,* N.J. Admin. Code § 19:25–7.1(d) ("A candidate . . . shall take such steps as are necessary and appropriate to insure that a campaign treasurer . . . complies with the recordkeeping requirements of this section and this chapter."); N.J. Stat. Ann. § 19:44A–11.2 (requiring that all contributions to a candidate or committee be used for proper purposes and not be converted for personal use); N.J. Admin. Code § 19:25–6.5 (same). In addition, state law authorizes the candidate to remove a committee treasurer, thus supporting an agent-principal relationship between the candidate and committee, and triggering common-law fiduciary duties. *See* N.J. Stat. Ann. § 19:44A–9(f) (providing that "[a] candidate . . . may remove a campaign treasurer" and that "[a] candidate may

serve as his or her own campaign treasurer").

At oral argument, the Government represented that these provisions "inform" the fiduciary duties alleged in this case, in addition to common law principles. This contention at the hearing is consistent with the Government's representation, in another footnote to its brief, that invocation of these provisions in the Indictment and the brief does not mean that the Government is alleging that ELEC or any other New Jersey agency were defrauded or that Defendants had a fiduciary duty to the state or the public. (Gov't Br. at 17 n.8.) Instead, the Government contends that the false reports pursuant to these provisions are "evidence of the defendants' concealment of the diverted cash contributions, and other material information, from the committees (and the contributors) and, therefore, are probative of, at least, the defendants' intent to defraud and the existence of a scheme to defraud of money, property, and honest services." (*Id.*) Defendants seize on this footnote, stating that "[t]he only arguable candidates for a predicate state-law violation—the state election statutes—are *specifically disavowed by the prosecution.*" (Defs.' Reply Br. at 10 (emphasis in original).) This Court disagrees that the Government has specifically disavowed these provisions. This Court must focus on the allegations of the Indictment, and the Indictment clearly grounds its allegations of fiduciary duty, in part, in these statutes. Whether the Government carries its burden with regard to the alleged duty, based in part on asserted contravention of these provisions, is a proof issue for trial and inappropriate to be considered at this stage.

Finally, Defendants contend that an honest services breach may not be committed by "inadvertently dishonest" treasurers who did not participate in the cor-

ruption of the person who owed honest services. (Defs.' Br. at 17–18; Defs.' Reply Br. at 12.) However, where Defendants have a fiduciary duty to the treasurers to ensure that they comply with state requirements, and they breached that duty, whether the treasurers were aware that they were not complying with state requirements is irrelevant. In this regard, the Government relies on *United States v. Potter*, in which defendants were charged with scheming to deprive the public of the honest services of the Speaker of the House of the Rhode Island State Legislature by making concealed corrupt payments to the Speaker. 463 F.3d 9 (1st Cir.2006). Defendants in *Potter* contended that the indictment was invalid because the Speaker was not a party to the defendants' alleged scheme and did not even know of the scheme. *Id.* at 16. The First Circuit reasoned that the Speaker *himself* could not be convicted "without proof of his knowing participation; but under the statute anyone could concoct a scheme to deprive Rhode Island citizens of [the Speaker's] honest services." *Id.* at 16–17. Here, this Court agrees that Defendant David Delle Donna could scheme to deprive the Committees and the treasurers of his honest services, and the honest services of the treasurers, without the treasurers knowing of the scheme. Defendants contend that *Potter* simply stands for the proposition that defendants could be found guilty of corrupting the Speaker even if it turned out that the Speaker "might prove unwilling or unable to perform, or that the scheme never achieved its intended end." (Defs.' Reply Br. at 12 (quoting *Potter*, 463 F.3d at 17).) The Court does not read *Potter* so narrowly. Defendants here schemed to defraud the Committees and the treasurers in diverting contributions and concealing their activity from the Committees.

■ For these reasons, this Court will deny Defendants' motion to dismiss Counts One and Two of the Indictment as to the honest services theory of mail fraud. Counts One and Two allege legally valid theories of mail fraud, and conspiracy to commit mail fraud, against both Defendants and under both a money or property *and* honest services theory. This Court will consider—at the appropriate time—whether to ask the jury to return a specific verdict as to the Government's two main theories of mail fraud, money/property and honest services. *See Murphy*, 323 F.3d at 110 (holding that where jury returns general verdict on honest services fraud and one of the Government's theories of fraud are found to be legally invalid, Court of Appeals must reverse conviction and remand for new trial).

## II. Defendants' Motion to Sever the Tax Counts (Counts Four and Five)

Defendants next ask this Court to sever Counts Four and Five, which charge the filing of materially false federal income tax returns, from the mail fraud and extortion charges of Counts One, Two, and Three. Count Five alleges that Defendants failed to report: 1) rental income from approximately five tenants that rented apartments from the Delle Donnas; and 2) "corrupt payments" for the benefit of Anna Delle Donna from I–1 for cosmetic surgery and a dog and related accessories as alleged in Count Three. (Indictment, Count Five at ¶ 4.) Count Four charges Defendants with failing to report rental income, but does not allege any underreporting related to the corruption charges. Defendants contend that because Count Four is "wholly unrelated to the other counts," it must be severed as a matter of law from Counts One, Two, and Three pursuant to Federal Rule of Criminal Procedure 8(b). (Defs.' Br. at 19.) Because Count Four must be severed, according to Defendants, this

Court should also exercise its discretion to sever Count Five and try the tax counts together, separately from the mail fraud and extortion counts. The Government, naturally, approaches this issue from an opposite perspective: the Government focuses on the relatedness of Count Five, while Defendants rely on the unrelatedness of Count Four. The Government argues that there is a "strong nexus between Count Five and the fraud and extortion counts," and therefore those "securely interconnected" counts are properly joined. (Gov't Br. at 28, 29.) Because joinder of Count Five is appropriate, the Government concludes, judicial economy dictates that its companion Count Four is properly joined as well.

### A. Joinder is Proper

■ Federal Rule of Criminal Procedure 8(b) governs the joinder of counts in multi-defendant cases. *United States v. Irizarry,* 341 F.3d 273, 287 (3d Cir.2003) (noting that "Rule 8(b) applies exclusively to issues of joinder of multiple defendants and that Rule 8(a) applies only in cases involving a single defendant charged with multiple offenses"); *see also United States v. Eufrasio,* 935 F.2d 553, 570 (3d Cir. 1991). "It is not enough that defendants are involved in offenses of the same or similar character; there must exist a transactional nexus in that the defendants must have participated in 'the same act or transaction, or in the same series of acts or transactions,' before joinder of defendants in a multiple-defendant trial is proper." *United States v. Jimenez,* 513 F.3d 62, 82–83 (3d Cir.2008) (quoting Fed.R.Crim.P. 8(b)); *see also Irizarry,* 341 F.3d at 287 ("Although the standards of Rule 8(a) and Rule 8(b) are similar, in that they both require a 'transactional nexus' between the

offenses or defendants to be joined, Rule 8(a) is more permissive than Rule 8(b) because Rule 8(a) allows joinder on an additional ground, i.e., when the offenses 'are of the same or similar character.' ").

■ This Court adopts the Government's approach to the joinder analysis: Rather than first assess whether Count Four is properly joined, this Court will examine whether joinder is proper with regard to Count Five before assessing its companion count.[9] This approach accords with the federal policy favoring joint trials. *See Zafiro v. United States,* 506 U.S. 534, 537, 113 S.Ct. 933, 122 L.Ed.2d 317 (1993). Under this analysis, this Court concludes that joinder of Count Five to the fraud and extortion counts is proper. Our Circuit has commented that "[j]oinder of tax and non-tax claims is not unusual." *United States v. McGill,* 964 F.2d 222, 241 (3d Cir.1992). Here, Count Five arises in part from the "same series of acts or transactions" charged in Count Three, because Count Five charges that Defendants failed to report income in the form of cash payments from I–1 that also form part of the basis of Count Three. In the related context of tax evasion charges, the Seventh Circuit has held that "[j]oinder of a tax evasion count is appropriate when it is based upon unreported income flowing directly from the activities which are the subject of the other counts." *United States v. Anderson,* 809 F.2d 1281, 1288 (7th Cir.1987). At oral argument, counsel for Anna Delle Donna contended that the amount of unreported rental income charged in Count Five "dwarfs" the amount of unreported income linked to Count Three's allegedly illicit payments. However, the court in *Anderson* persuasively concluded that even though "the bribe was only one of three sources of

---

9. Defendants' approach might have merit if Count Four had no overlap with *any* of the other Counts in the Indictment. However, such is not the case here.

income in the tax count does not alter the fact that the tax count was based in part on the same transaction which was a basis for one Hobbs Act count and the RICO count." *Anderson,* 809 F.2d at 1288. Here, even though Count Five also charges unreported rental income, this tax count is still based in part on the same transactions which form the basis for the Hobbs Act charge in Count Three. Thus, Count Five is properly joined to Counts One, Two and Three.

Furthermore, it is beyond peradventure that the two tax counts, Counts Four and Five, arise from the same series of acts or transactions because they both charge the underreporting of certain rental income, and as the Government outlines, involves substantial overlapping evidence and the same witnesses. (Gov't Br. at 29; *see also* Defs.' Br. at 24–25 (arguing that Counts Four and Five are mostly "substantively identical" and should be tried together).) This Court must therefore consider whether trying Count Four with the other Counts would unduly prejudice Defendants.

### B. This Court Declines to Sever Count Five

█ If counts are properly joined, Federal Rule of Criminal Procedure 14(a) provides courts with discretion to sever counts if joinder "appears to prejudice a defendant or the government." Fed. R.Crim.P. 14(a). The Supreme Court has held that joint trials are preferred in the federal system and "when defendants properly have been joined under Rule 8(b), a district court should grant a severance under Rule 14 only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro,* 506 U.S. at 537, 539, 113 S.Ct. 933.

"[D]enial of severance is committed to the sound discretion of the trial judge." *Eufrasio,* 935 F.2d at 568; *see also Zafiro,* 506 U.S. at 541, 113 S.Ct. 933 ("Rule 14 leaves the determination of risk of prejudice and any remedy that may be necessary to the sound discretion of the district courts."). Defendants have the burden to show prejudice from the joinder. *Id.*

Defendants contend that because Count Four is wholly unrelated to Counts One, Two, and Three, however, severance of both tax counts would "not result in significant duplication of the bribery evidence, and will carry the added benefit of avoiding the inevitable spillover prejudice from the bribery to the tax count." (Defs.' Br. at 25.) As the Government responds, merely alluding to "inevitable spillover prejudice" does not satisfy Defendants' burden under Rule 14. Defendants argue that issues of prejudice and efficiency are "moot" because Rule 8 requires two trials on the fraud/extortion charges and the tax charges, but this Court concluded above that joinder of Count Five is proper under Rule 8. Therefore, this Court proceeds to the Rule 14 analysis and weighs the efficiency of a joint trial against any prejudice to Defendants.

█ With regard to Defendants' reference to spillover prejudice, one concern with joint trials "is that the jury may allow the evidence produced with respect to one defendant or one offense to 'spillover' and influence their decision regarding a different defendant or a different offense." *See United States v. Kopituk,* 690 F.2d 1289, 1320 (11th Cir.1982). However, as the Eleventh Circuit noted, "[t]he most efficacious tool to protect against this danger is a clear cautionary instruction from the trial court as to the duty of the jurors to consider each defendant and the evidence against him or her separately." *Id.* Our Circuit has recognized that to show preju-

dicial joinder, "[s]ome exacerbating circumstances, such as the jury's inability to 'compartmentalize' the evidence, are required." *United States v. Urban*, 404 F.3d 754, 776 (3d Cir.2005) (citations and quotations omitted). At oral argument, counsel for David Delle Donna argued that a jury would be unable to compartmentalize the tax counts and fraud/extortion counts, and particularly that several tax-specific issues would distract the jury and lead to prejudice. This Court, exercising its discretion, disagrees. This Court has no doubt in this case that the jury will have little difficulty compartmentalizing the evidence regarding the corruption charges and the rental income portion of the tax charges. *See United States v. Lore*, 430 F.3d 190, 205 (3d Cir.2005) (stating that because evidence as to multiple counts and multiple defendants "was relatively straightforward and discrete, not involving overly technical or scientific issues ... we do not doubt that the jury reasonably could have been expected to compartmentalize the evidence as it related to Lore and actually did so"). The Court agrees with the Government that the charges in the Indictment are not so complex and the evidence the Government intends to introduce appears to not be so "massive" that the jury will have much trouble "keeping it straight." (Gov't Br. at 31.) This Court will endeavor to ensure the jury's fair consideration through appropriate jury instructions.[10]

"Joint trials of defendants named in a single indictment are favored because they 'conserve state funds, diminish inconvenience to witnesses and public authorities, and avoid delays in bringing those accused of crime to trial.'" *Jimenez*, 513 F.3d at 82 (quoting *United States v. Lane*, 474 U.S. 438, 449, 106 S.Ct. 725, 88 L.Ed.2d 814 (1986)). A joint trial of all charges in this matter comports with this federal policy, advances judicial economy, and will not unduly prejudice Defendants. Defendants contend that the Government employs "daisy-chain logic" in connecting mostly unrelated counts. (Defs.' Reply Br. at 13.) Yet in this case, with only five counts and relatively discrete issues to be presented to the jury, this Court cannot conclude that the "daisy chain" allegedly constructed by the Government is so long that Defendants are unduly prejudiced. Any potential prejudice may be cured by careful jury instructions. For these reasons, this Court will deny Defendants' motion to sever the tax charges.

## III. Defendants' Motion for a Bill of Particulars

Defendants request that this Court order the Government to produce a bill of particulars pursuant to Federal Rule of Criminal Procedure 7(f). Whether to grant such a request lies in this Court's discretion. *Urban*, 404 F.3d at 771. "A bill of particulars is a 'formal, detailed statement of the claims or charges brought by a plaintiff or a prosecutor [.]'" *Id.* (quoting Black's Law Dictionary 177 (8th ed.2004)). A bill of particulars serves "'to inform the defendant of the nature of the charges brought against him, to adequately prepare his defense, to avoid surprise during the trial and to protect him against

10. In *Urban*, the Third Circuit observed that "the District Court expressly instructed the jury to compartmentalize the evidence, stating in its instructions that 'the fact that you may find a defendant guilty or not guilty of one of the offenses should not control your verdict as to any of the other offenses charged,' and that 'you must give separate and individual consideration to each charge against each defendant.'" *Urban*, 404 F.3d at 776. The court "regard[ed] such instructions as persuasive evidence that refusals to sever did not prejudice the defendant." *Id.; see also Lore*, 430 F.3d at 205–06. This Court will give similar instructions to the jury in the Court's charge.

a second prosecution for an inadequately described offense.' " *Id.* (quoting *United States v. Addonizio,* 451 F.2d 49, 63–64 (3d Cir.1972)). Our Circuit has held that a bill of particulars need only be issued "where an indictment fails to perform these functions, and thereby "significantly impairs the defendant's ability to prepare his defense or is likely to lead to prejudicial surprise at trial." " *Urban,* 404 F.3d at 771–72 (quoting *United States v. Rosa,* 891 F.2d 1063, 1066 (3d Cir.1989)). This Court has held that "when discovery provided by the government fills in the outline of the indictment, the necessity for a bill of particulars declines." *Caruso,* 948 F.Supp. at 393; *see also Urban,* 404 F.3d at 772 (reasoning that "access to discovery further weakens the case for a bill of particulars"). "A bill of particulars is intended to give the defendant 'only the minimum amount of information necessary to permit the defendant to conduct his *own* investigation.' " *Caruso,* 948 F.Supp. at 393 (quoting *United States v. Smith,* 776 F.2d 1104, 1111 (3d Cir.1985)).

Defendants request a bill of particulars with regard to the mail fraud and extortion counts. Specifically, they seek the identities of I–1, I–2, and "all persons, whether or not associated with the campaign Committees, who allegedly knew of or participated in the offenses." (Defs.' Br. at 27.) They also ask, in lieu of this Court dismissing the mail fraud charges for insufficiency, that the Government disclose: 1) the particular theories of mail fraud upon which it relies; 2) the particulars as to each theory, including the money or property of which the Committees were defrauded and the identities of anyone of whose honest services the Committees were deprived.

This Court declines to order a bill of particulars. The Government represents that

discovery in this case has been comprehensive, and defendants have had at their disposal for some time all of the documentary evidence that will be used by the government to prove its case. Many of the documents turned over, including grand jury transcripts, numerous FBI 302s, and a lengthy and detailed search warrant affidavit in support of the search of the defendants' home, have amplified the already extensive detail in the Superceding Indictment.

(Gov't Br. at 33.) The Government also states that it has disclosed its *Giglio* material. This full discovery obviates any need for a bill of particulars here. *Urban,* 404 F.3d at 772. With regard to the Government's theories of mail fraud and the particulars supporting them, the bill "is not designed to compel the government to detailed exposition of its evidence or to explain the legal theories upon which it intends to rely at trial." *United States v. Burgin,* 621 F.2d 1352, 1359 (5th Cir.1980). In any event, not only does the Indictment provide sufficient notice of the mail fraud theories advanced by the Government, the Government's response brief fully describes, in great detail, the theories it plans to pursue at trial. As for the identities of I–1, I–2, and others, where the Indictment and discovery contains "sufficient factual and legal information for the defense to prepare its case … it is not essential that an indictment identify victims by their given names." *United States v. Wabo,* 290 F.Supp.2d 486, 490 (D.N.J. 2003) (denying request for bill of particulars where indictment identified victims by their initials).

Based on the sufficiency of the factual and legal information in the Indictment and the discovery provided by the Government, Defendants have more than adequate information to inform them of the

nature of the charges against them, to prepare their defenses, and to protect them against a second prosecution. *Caruso,* 948 F.Supp. at 393 (citing *Addonizio,* 451 F.2d at 63–64). For these reasons, Defendants' motion for a bill of particulars will be denied.

### IV. Motion for Disclosure of Rule 404(b) Material 30 Days before Trial

Finally, Defendants request that the Government be ordered to produce Federal Rule of Evidence 404(b) material 30 days prior to trial. Rule 404(b) bars the admission of evidence of "other crimes, wrongs or acts" to prove "the character of a person in order to show action in conformity therewith." Such evidence may be admissible for other purposes, "such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Fed. R.Evid. 404(b). The Rule requires that, on a defendant's request, the prosecution in a criminal case must provide "reasonable notice in advance of trial ... of the general nature of any such evidence it intends to introduce at trial." *Id.* In this Court's standard Order for Discovery and Inspection, issued on January 3, 2008, the Court ordered the Government to provide such notice not less than 10 days before trial. (Doc. No. 12 at ¶ 3.)

At oral argument, the Government represented that it has complied with its notice obligations under Rule 404(b) and this Court's Order. Defendants did not object to this representation. Therefore, this Court will deny Defendants' motion for early disclosure of Rule 404(b) material as moot.

### V. Government's Motion for Reciprocal Disclosure

The Government has cross-moved for reciprocal disclosure pursuant to Federal Rule of Criminal Procedure 16(b)(1)(A). This Rule provides that where the Government complies with a defendant's request for disclosure under Rule 16(a)(1)(E), defendant must then similarly allow the Government, on request, to inspect documents and objects in defendant's possession which defendant intends to use in its case-in-chief at trial. Fed.R.Crim.P. 16(b)(1)(A). The Government has complied with its discovery obligations, and therefore, to the extent that Defendants have not already provided reciprocal discovery, this Court orders Defendants to provide such reciprocal discovery. This Court will grant the Government's motion in this regard.

### Conclusion

For the foregoing reasons, it is hereby ORDERED that Defendants' pretrial motions (Doc. Nos. 13 and 14) are DENIED, and that the Government's cross-motion for reciprocal discovery (Doc. No. 18) is GRANTED. Specifically, it is hereby ORDERED that:

1. Defendants' motion to dismiss Counts One and Two is DENIED.

2. Defendants' motion to sever Counts Four and Five from Counts One, Two, and Three is DENIED;

3. Defendants' motion for a bill of particulars is DENIED;

4. Defendants' motion for disclosure of Rule 404(b) material 30 days before trial is DENIED AS MOOT; and

5. The Government's motion for reciprocal discovery is GRANTED.